UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – –   X


JULIAN KAHLON,

                                        Plaintiff,                    1:20  Civ. 03774

    v.                                                        **COMPLAINT**


PROJECT VERTE INC.

                                        Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – –   X


Plaintiff Julian Kahlon ("Plaintiff" or "Kahlon"), through his undersigned attorneys, as and for his complaint against defendant Project Verte Inc. (the "Company" or "Defendant") alleges as follows:


## NATURE OF THE ACTION


1.      Kahlon, the former Chief Executive Officer of the Company, seeks compensation he is due under his employment agreement, which has been unlawfully withheld.

2.      Kahlon entered into an employment agreement with the Company on September 1, 2019 which granted Kahlon, amongst other things, a salary and bonus, stock options, and financial compensation in the event that the agreement was terminated, including but not limited to salary continuation, bonus, and insurance coverage.

3.      Kahlon's employment agreement was unilaterally terminated by the Company on March 5, 2020.  Although Defendant claimed in the termination letter informing Kahlon of his termination that Kahlon was terminated "for cause," there is no basis for that claim.  The only

reason provided for Kahlon's termination was that he allegedly failed to provide his signature to self-serving convertible notes that he was informed of and presented with for the first time a few days prior to his termination. Kahlon never refused to execute the convertible notes. And even if Kahlon were terminated for cause, which he was not, the Company failed to follow required protocols to make such termination effective.

4.      At the time of Kahlon's termination and thereafter, the Company has refused to pay Kahlon what he is entitled to under the employment agreement, and has wrongfully eviscerated his right to obtain deeply discounted Company stock options.

5.      Kahlon brings common law claims for breach of contract and statutory claims under New York's Labor Law, N.Y. Lab. Law, § 190 et seq. arising out of Defendant's failure to pay him compensation and other financial earnings he lawfully earned, accrued and is entitled to under the employment agreement, and a claim for the Company's failure to provide him COBRA notification required under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161 et seq.

6.      Kahlon seeks damages sustained as a result of Defendant's unlawful conduct in an amount to be proven at trial, but believed to be in excess of $1,000,000.00, as well as punitive damages in the amount of $1,000,000.00, attorneys' fees and interest.

<u>**PARTIES**</u>

7.      Plaintiff, Julian Kahlon, is a resident of New York County in the State of New York and between September 1, 2019 and March 5, 2020, was employed by the Company in the position of Chief Executive Officer ("CEO").

8.      Project Verte Inc. is an e-commerce company, incorporated in Delaware, with its principal place of business located in Atlanta, Georgia. The Company provides an ecosystem

powered by user participation and community intelligence to help brands grow and improve customer experience through seamless backend processes, expanded sales channels, and optimized fulfillment.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, in that it involves a federal question under 29 U.S.C. § 1161 *et seq.*, and 29 U.S.C.  § 1132.  This Court has supplemental jurisdiction over Kahlon's state and statutory claims under 28 U.S.C. § 1367(a) because such claims are related.  This Court also has jurisdiction over Defendant pursuant to 28 U.S.C. § 1332(a), in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.  The Court has personal jurisdiction over Defendant because, Defendant maintains a business office in the State of New York, the claims arise out of Defendant's contacts with New York, and Defendant intentionally acted in such a way as to cause injury to Kahlon in the State of New York.

10.     Venue is proper in this district by virtue of 28 U.S.C. § 1391, because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, and because the Defendant is subject to personal jurisdiction within the district.

## FACTS COMMON TO ALL CLAIMS

### A.  Kahlon's Contractual Rights to Compensation

11.     Kahlon is a highly experienced communications professional, having worked closely with consumer brands for years, and assisting them with strengthening their relationships with customers through better communication and digital experiences.  Prior to his involvement with the Company, Kahlon led the rebrand for Haagen-Dazs as a Creative Director at Grey

Group and headed the ADP innovation lab team that designed one of ADP's core work management solutions.

12.     Kahlon co-founded Project Verte Inc. in January 2017. The Company is the world's first social e-commerce platform built on blockchain.

13.     Kahlon initially served as the Company's Treasurer in 2017 at the time of the Company's formation and took on the role of CEO of the Company on September 1, 2019.

14.     In connection with his role as CEO, Kahlon entered into an employment agreement with the Company (the "Employment Agreement") which became effective as of September 1, 2019 (although the date was misprinted on the document as September 1, 2018) and was to expire on September 1, 2022 unless extended or terminated prior to that time.  The Employment Agreement is attached to the Complaint as **Exhibit A**.

15.     Under Section 3.2 of the Employment Agreement, Kahlon, as CEO, was given "such authority as is commensurate with the position of Chief Executive Officer of the Company" and specifically allotted authority to make decisions without Board approval including, adopting and modifying budgets, incurring accounts payable and accrued liabilities incurred in the normal course of business, entering into and terminating contracts having a value of up to $1,000,000, purchasing assets, entering transactions, entering into, amending, and terminating employment and consulting agreements, paying Company expenses, purchasing goods or services for the Company from any third party up to a value of $500,000, and numerous other additional powers.

16.     In exchange for Kahlon's role in overseeing the day-to-day operations of the Company as CEO, Kahlon was entitled to compensation and benefits which were provided for in the Employment Agreement.

17.     Under Section 5.1 of the Employment Agreement, Kahlon's base salary shall not be at an annualized rate of less than $140,000 per year, which was to be paid in substantially equal installments throughout the year consistent with normal payroll practices of the Company. The Employment Agreement required that the base salary was to be reviewed at least annually and could increase but not decrease based primarily on Kahlon's performance.  In 2019 and 2020 Kahlon's salary was annualized at $140,000 per year.

18.     Additionally, as detailed in Section 5.2 of the Employment Agreement, Kahlon was entitled to a discretionary cash bonus of up to 40% of his base salary, which was to be based on the achievement of key performance indicators that were to be established by the Board and Kahlon within 60 days following the effective date of the Employment Agreement and thereafter evaluated in good faith by the Board of Directors or the Compensation Committee. The cash bonus was to be paid at the same time other bonuses were paid to the Company's other senior executive officers.  During his employment Kahlon never received a bonus.

19.     The Agreement also provides, as detailed in Section 5.3, that Kahlon was to be granted an option to purchase 269,427 shares of the Company's common stock with a term for ten years that was to vest and become exercisable during his employment upon the satisfaction of certain performance conditions agreed to by the Board and Kahlon within six days following the effective date of the Employment Agreement.

20.     The Employment Agreement also provides, as detailed in Section 5.4, that Kahlon was entitled to 20 business days of paid time off per year as well as participation opportunities in any pension, retirement, insurance and other employee benefit plans and programs made available by the Company to other senior executives.  For the Company's 401K plan established by the Company, Kahlon was entitled to the same "matching" and other rights and benefits

provided by the Company to its other senior executive officers.  He was further entitled to coverage under the Company's directors and officers liability insurance policies to the same extent as the Company's other senior executives.

21.     The Company also guaranteed reimbursement to Kahlon for ordinary and necessary business expenses in a reasonable amount incurred by him in performing his duties under the Agreement, as detailed in Section 5.5 of the Employment Agreement.

### B.  Kahlon's Record of Achievement

22.     During his employment by the Company Kahlon was an exemplary employee who worked tirelessly day and night to fulfill the Company's vision.  In overseeing the Company, Kahlon hired the developers, engineers, creatives, and e-commerce professionals and oversaw a large team of numerous personnel as well as an international development team of individuals and emerging businesses to create the Company's e-commerce ecosystem powered by user participation and community intelligence in order to help brands grow and improve their customer experiences.  Much of these efforts and accomplishments concerned overseeing and enabling the creation of community-powered technologies utilizing blockchain and other technological components which facilitated the Company's mission of bringing greater transparency and wider participation into e-commerce.  Kahlon also served as a face for the Company, speaking on multiple panels and in stage presentations, as well as participating in trade shows.

23.     In connection with Kahlon's oversight and diligence, the Company developed state of the art, patented blockchain technology in rapid progression.

### C.  The Company Terminates Kahlon's Employment on False Pretenses

24.     Despite Kahlon's benefits to the Company, the Company has failed to provide Kahlon with the full compensation that he has earned and is entitled to under the Agreement.

25.     On March 5, 2020 Kahlon was provided with a Notice of Termination from the Company.  No prior notice of the termination was provided.  As detailed in Section 2 of the Employment Agreement, a Notice of Termination for Cause "shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment."  The Notice of Termination, attached to the Complaint as **Exhibit B**, alleged that Kahlon was terminated "for cause" and provided only one supposed reason in alleged support of that claim – because, as it was alleged by the Company, Kahlon breached a duty to the Board of Directors of the Company when he allegedly "refused to execute and deliver" convertible notes.

26.     The Employment Agreement defines "cause" in Section 6.9.1 to mean "(a) alcohol abuse or the use of controlled drugs (other than in accordance with a physician's orders); (b) the Executive's repeated or substantial refusal, failure, or inability to perform (other than due to illness or disability), or gross negligence or willful misconduct in the performance of, his duties; (c) material breach of this Agreement or any other agreement with or duty owed to the Company or its Affiliates, which breach (if curable) remains uncured thirty (30) days after receipt of written notice thereof; (d) conduct of the Executive involving dishonesty adversely affecting the Company or any of its Affiliates, including fraud, embezzlement, theft or other misuse of property; (e) any commission of or entrance of a plea of guilty or *nolo contendere* to a felony, any crime of moral turpitude or any other crime that materially and adversely affects the operations, financial performance or customer relationships of the Company or its Affiliates, or (f) a material violation of any written policy of the Company or its Affiliates in effect from time

to time, including, without limitation, policies relating to discrimination, harassment, fraternization and nepotism."

27.     Although the Notice of Termination alleges that Kahlon failed to repeatedly or substantially refuse to perform multiple duties, the Notice of Termination only alleges one supposed "duty" to the Company that Kahlon allegedly refused to perform, thus requiring under Section 6.9.1(c) of the Employment Agreement a thirty (30) day cure period to elapse before Kahlon could be terminated.

28.     Specifically the Notice of Termination alleged – and falsely so – only that Kahlon refused to provide his signature to convertible notes as part of an offering, which was approved on February 26, 2020 at a special meeting of the Board of Directors.

29.     As detailed below, in contrast to the blatantly false allegations in the Notice of Termination, at no time did or has Kahlon refused the execute the convertible notes.  There is simply no basis for the claim, as alleged in the Notice of Termination, that Kahlon was terminated "for cause."

30.     Prior to the subject Board meeting at which the convertible notes were allegedly approved, Kahlon was not given any prior notice that the Board was holding a special meeting or intending to address approval of convertible notes for the Company, despite his repeated requests to the Board that he be given at least one week of notice as to any forthcoming Board meetings and that he be provided with notes or minutes from any Board meetings, of which none were provided to him.

31.     Kahlon first received notice of the subject February 26, 2020 Board meeting and convertible notes allegedly approved therein on the following day, February 27, 2020, when Shoshana Isakov ("Isakov"), an individual who had no relationship with the Company, merely

8

referenced them in an email she sent to him to ask if he would be funding the Company's "capital call pursuant to the convertible note approved by the Project Verte's Board of Directors."  Isakov was at the time an accountant at Continental Ventures, which is a wholly independent real estate development company from Project Verte Inc. that is led by Jane Gol ("Gol"), who serves as Continental Ventures' President at the same time as serving as Project Verte Inc.'s Chair of the Board of Directors, and by Amir Chaluts ("Chaluts"), who serves as Continental Ventures' CEO at the same time as sitting on the Board of Project Verte Inc.

32.     A few hours later, at 6:10 pm, another employee of Continental Ventures emailed Kahlon copies of convertible notes.  Specifically they were sent to him by Sara Rubenstein ("Rubenstein") who was the Company's Secretary.

33.     Rubenstein also held herself out to be General Counsel of Project Verte Inc., despite clear conflicts of interest in taking on that role and alleging to support the best interests of Project Verte Inc., while at the same time she was employed and subjected to the self-serving wants and needs of Project Verte Inc.'s Board members, Gol and Chaluts.

34.     Upon review of the convertible notes, Kahlon was struck by the fact that they reflected a capital valuation of the Company for far less than the valuation determined by a third party and previously relied upon by the Company.  The convertible note valuation was essentially pulled out of thin air as there was no reference to any third party or internal analysis that would justify such a sum.  Kahlon knew that the valuation was roughly 85% less than the valuation based on the independent third party analysis which the Company had used in connection with negotiations with investors and which had been based on generally accepted valuation techniques.  In contrast, the artificially low figure had no legitimate basis. Kahlon suspected that it had been concocted as a self-serving mechanism to allow Company Board

9

members, Gol and Chaluts, and their Company investment vehicle AJ Group to obtain lower priced equity in the Company through use of funding the convertible notes.  The suspect valuation, coupled with Kahlon's knowledge and belief of prior and repeated potential misconduct by AJ Group representatives, including concerns that its representatives were using Kahlon's blank signature on documents on behalf of the Company without his knowledge or consent, prompted him to pursue further due diligence in preparation for executing the convertible notes.  Notably, in addition to any use of Kahlon's signature on Company documents without his permission during his employment, following Kahlon's termination, the Company continued to use Kahlon's signature to bind the Company on official Company documents without any authorization from him to do so.

35.    Given his concern and suspicions of improper behavior, fifteen minutes after receiving the convertible notes, Kahlon emailed Rubenstein and Andrew Hulsh ("Hulsh"), The Company's outside counsel, of the law firm of Pepper Hamilton LLP, and requested executed Project Verte Inc. documentation in order to perform further analysis.  Kahlon received no response to his request.

36.    The next morning on February 28, 2020, Kahlon emailed the Company Board of Directors and Hulsh regarding the matter.  He raised concern that he was being asked to sign documents that he just received without notice of details or notification about the "emergency board meeting."  He further expressed concerns that he had never obtained an agenda for the meeting, that Rubenstein appeared to have more knowledge of the matter than he did, as the CEO, despite the fact that Rubenstein as self-appointed General Counsel was conflicted in working directly for the Company and at the same time as an employee of Company investors and select Board members who were seeking to advantage themselves at the expense of the

10

Company.   Most significantly, Kahlon directly expressed concerns about the terms of the funding asking counsel "Isn't it the company's right to have a chance to raise funds on better terms?"  Kahlon expressed concern that, based on the facts he understood to have taken place, the Board members seeking to advantage themselves appeared unwilling to fund the Company in good faith in an effort to gain financial advantage by self-servingly downgrading the value of the Company without basis.  Kahlon indicated that the Company issues and integrity were affecting other employees of the Company, including Shlomi Amoyal ("Amoyal"), the Company Chief Technology Officer, who Kahlon viewed to be the Company's "greatest asset."  As Kahlon informed the Board and Hulsh, Amoyal was prepared to leave the Company.

37.     Kahlon further asked Hulsh to "withhold from discussing these matters with anyone within or outside of the company until I fully understand what it is that I am signing. Now please, help me understand."  Kahlon indicated that he was concerned that he was being asked to be a "rubber stamp" without evaluating and analyzing the significant actions at play on which he was asked to blindly sign off.

38.     Kahlon further expressed concern to Hulsh and the Board that his requests for Company documentation made the day prior seeking to confirm all was above board were being ignored.

39.     Hours later Hulsh responded to Kahlon's email stating that Hulsh would only address Kahlon's concerns after Kahlon signed the convertible notes.   Hulsh wrote "[g]iven the urgency to the Company of receiving the funding under the convertible notes today (and the related wire transfer deadline), it is essential—to accomplish that funding—that you sign the documents that Sara sent to you last night and return them to her no later than by 3:00 pm today, February 28, 2020."  Hulsh appeared to be giving Kahlon an ultimatum to sign the convertible

notes with less than 24 hours to obtain analysis concerning the request after first being provided with them.  But, aside from Kahlon's other concerns, at this time he also became concerned about the veracity of Hulsh's claim for urgency in executing the notes because he knew that Company payroll had been effected since he and all other employees were recently paid, and thus the Company had sufficient funds in its bank account.

40.     Shortly thereafter Kahlon again pleaded with Hulsh to provide information about the documentation he was being asked to sign.  He expressed his ethical concerns for the Company and affirmed his need and obligations as CEO to do due diligence.  Specifically, in an email at 3:20 p.m., Kahlon stated, "I would love to sign if I knew what I was signing and had all the details.  I still haven't gotten the specifics of the voting. I'm trying to go through it and to get the whole picture so I can better understand. I hired a lawyer to guide me through it, but Sara [Rubenstein] still has not sent me any of the requested paperwork.  I had just received something yesterday to sign with zero context. I have no minutes, no notes, and what questions were asked at the board meeting. Nothing. It is my responsibility to know what I am signing . . .  Please make sure that I get all the documents I have asked for so I can give it to my lawyer to review and possibly get to a resolution."

41.     The following day, on Saturday, February 29, 2020, Hulsh responded to Kahlon stating again, without further response to Kahlon's concerns, that "the execution of these documents is a critical matter for Project Verte, the failure of which may result in the Company's inability to discharge its many obligations, including current payroll."  Hulsh accompanied his email with a summary of terms for the convertible note offering for the first time.  He further stated that the convertible notes must be signed and that "the Company is currently unable to meet any of its financial obligations absent a cash infusion from some investors or a loan."

42.     The Notice of Termination provided to Kahlon also references the February 29 email from Hulsh to Kahlon indicating that execution of the convertible notes was "a critical matter for Project Verte, the failure of which may result in the Company's inability to discharge its many obligations, including current payroll."   As further detailed in the Notice of Termination, the Company's counsel indicated that Kahlon's signature "has unreasonably placed the Company, which was (and is) running extremely low on cash funds, at risk of being unable to discharge its financial obligations to employees and other stakeholders."   However, as detailed above, Kahlon was aware that these statements by the Company's lawyer were false as Kahlon knew for a fact at this time that the Company was able to meet its financial obligations, given that the Company is funded as needed and the Company's bank account status had to be funded in order to effect the Company payroll, which Kahlon was aware had occurred.

43.     On March 1, 2020, Kahlon again reiterated his request for documents to Hulsh, stating that he had "asked for Verte documents and the board meeting record numerous times over several days and haven't received them" and again refusing to serve as a "rubber stamp." Kahlon again raised his concerns about the transaction for the benefit of the Company and stated that

> [l]ooking back, I can say that this matter was managed poorly, which created the issue that has brought the suspicion level to code red. I was not informed of the purpose of the meeting, the agenda, or the desirable outcomes. I wasn't even informed of the original meeting!  In the event you knew of it ahead of time, you must bring it to my intention promptly before the meeting, discuss it with me and advise me. This was not a routine board meeting, it was an emergency board meeting for god sake. You know that my approval for any decision is needed (or maybe you forgot?) and even more so because you know that the majority of the board are the founders and that they are going to vote on matters that involve them, benefiting themselves directly. Are you not seeing it? Don't you think that the bare minimum is to assure clean hands?  Tell me what you did to make sure that everything was done clean and that no one can

13

revisit this later and say it wasn't?  I'm Project Verte's gatekeeper, do you think you can bully me into signing off on something like that without proper counseling?  Especially under the current circumstances.  We could've easily done it properly, and you know exactly what I mean, this you didn't do.  You can easily call it an ambush, it feels that way to me.  Just because of the nature of this kind of a decision, it deserved more time to thoroughly discuss and understand all of the long term consequences. It might be beyond your understanding. I will leave it at that.  This is just a basic action that we had to perform to get some of the responsibility off of us in case of a challenge. You should have got (or me if I knew) a reputable outsider to give us at least a ballpark company valuation . . . I have sent you a few emails that you have yet to comment on. I have asked for your opinion on several matters and you chose to ignore me. Are you ignoring Project Verte's CEO?  You forget that you are working for Project Verte first and then for the founders and members of the Board. Note: I don't appreciate the tone in your emails, it makes me feel bullied, threatened, and you're pushing me to sign something that looks shady.  Please make sure to be professional. I'm asking you again, address my emails.  Answer my questions and give me your opinions in writing and I will consider your recommendations.

44.     Later that afternoon Hulsh sent Kahlon an email that failed to address his substantive concerns regarding the convertible notes or his other ethical concerns.  However Hush did state that "[i]f the company can find funding on better terms from here on out, the funding shareholders have said they would be happy to see that.   And the other initial stockholder, TNJ, was invited to participate in this financing on the same pro rata terms, and that remains available right now."

45.     Kahlon is aware that on March 2, 2020 another special board meeting was noticed for the following day.  Although Kahlon was not made aware of that meeting at that time by the Secretary of the Company, he was informed by Jossef Kahlon, Kahlon's father and an investor and Board member of the Company, that the purported purpose of the meeting, as scheduled by the Secretary, was to address "immediate need to fund the Company for the March 2020 rents

14

and other items that could not be funded due to lack of sufficient funds to pay these expenses." The email is blatantly false given that, as Kahlon was aware, funds were administered to the Company on an as-needed basis and were already available in the Company's bank account to provide payroll.

46.     Kahlon received no more communications or the documentation he had repeatedly requested prior to receiving the Notice of Termination on March 5, 2020, which was executed by Gol, as detailed above, and stated without basis that Kahlon was terminated for cause.

47.     Kahlon's actions and communications with respect to executing the convertible notes were intended to  ensure that the Company's best interests were protected, and to avoid any improprieties in connection with raising funds on the best terms possible for the Company.  As such his actions were consistent with the authority granted to him under his Employment Agreement and fully in accord with his duties to the Company as CEO.

48.     The Notice of Termination indicated therein that it was effective immediately. However the Notice of Termination failed to provide Kahlon with at least 30 days advance written notice of his termination which Section 6 of the Employment Agreement requires the Company to do in terminating Kahlon other than for cause.

49.     As detailed above, although the Notice of Termination alleges that Kahlon failed to repeatedly or substantially refuse to perform multiple duties, the Notice of Termination only alleges one supposed duty that Kahlon allegedly refused to perform.  Kahlon was not given 30 days to cure his alleged violation of the duty to the Company, in direct violation of Section 6.9.1 of the Employment Agreement that requires the Company to give Kahlon written notice of the alleged violation of duty and to allow Kahlon 30 days after receipt of such notice to cure the

alleged violation before the Company can terminate him for cause based on violation of a duty owed by him to the Company.

50.     By denying Kahlon the required cure period, the Company also wrongfully excluded him from exercising his stock option grant during that period under Section 5.3 of the Employment Agreement, which entitled him to purchase shares in the Company's common stock at an economically advantageous price during his employment.

51.      In addition to receiving no notice of termination prior to his effective termination date, Kahlon was given only four business days upon even learning of the convertible notes before he was terminated.

52.     On information and belief the Company sought to remove Kahlon from his employment solely in an effort to drive a dispute that Gol and Chaluts were and remain engaged in with Kahlon's father, Jossef Kahlon.  In doing so, Gol and Chaluts on information and belief also engaged in other unethical behavior to advantage themselves *vis-à-vis* the Company, including infusing the Company with counsel and employees who maintained conflicts of interest and orchestrating use of Kahlon's signature without his authorization for self-advantageous purposes.  Gol and Chaluts prevented Kahlon from exercising his rights as CEO of the Company, for example by overruling his attempts to meet payment obligations to third parties on behalf of the Company, which, in allowing them to hide behind Kahlon as the face of the Company's failures of compliance – despite Kahlon's attempts to enforce the Company's obligations – hurt Kahlon's reputation.  On information and belief Gol and Chaluts concocted a ruse to terminate Kahlon on false pretenses to allow themselves to move forward with their self-serving agenda of driving their dispute with Kahlon's father, and in obtaining financial benefit from the convertible notes that they proceeded to have executed without the need for Kahlon to

do so shortly after terminating him. Gol and Chaluts falsely alleged that Kahlon was terminated for cause in order to avoid paying Kahlon what he was entitled to under the Employment Agreement. Ironically one of the main purposes of the Company, which was extensively funded by Gol and Chaluts, was to advance consumer desire for clear and ethical business practices by tapping into the inherent transparency and accessibility of blockchain. Conversely, despite the fact that Chaluts and Gol maintained extensive financial power and had tremendous business experience, including in controlling and overseeing dozens of high net worth real estate ventures in Manhattan and elsewhere and serving multiple times on company boards, they infused the Company with fraud and unethical acts in self-serving efforts to obtain further financial benefits and control.

### D. Kahlon is Entitled to Compensation under the Employment Agreement Which the Company Refuses to Pay Him

53.     The Defendant in unilaterally deciding to terminate Kahlon failed to adhere to the Employment Agreement by misrepresenting the reason for Kahlon's termination and by affording him no notice or 30-day cure period as required thereunder. Additionally, the Company has refused to compensate Kahlon what is lawfully due to him under the law and what is contractually mandated upon termination other than for cause in the Employment Agreement.

54.     As there is no basis under a theory of cause to have terminated Kahlon, as the Employment Agreement mandates in Section 6.1.2, Kahlon is to be paid his base salary in the amount prevailing on the date of involuntary termination "for the greater of (i) the balance of the [three year term of the Employment Agreement] or (ii) a period equal to twelve months following the effective date of the termination . . . payable in accordance with the Company's standard payroll practices." Under application of this provision, Kahlon is owed roughly $348,118. Kahlon has been paid none of this compensation by the Company.

55.     For the same reasons, Section 6.1.3 mandates an additional cash bonus equal to 100% of Kahlon's base salary at the time of the termination to be paid in the year following employment termination at the time annual bonuses are paid to other senior executives of the Company, or if no such bonuses are paid, on the first anniversary of the termination.   The Company has refused to provide this required compensation to Kahlon, which must be provided in the amount of $140,000.

56.     The Company also owes Kahlon "waiver of applicable premium otherwise payable for COBRA continuation coverage . . . for a period equal to twelve months following termination" which it has not provided to him, and refuses to do.   Additionally, despite promising to Kahlon in the Notice of Termination that "[u]nder separate cover you will receive notice of your rights concerning your benefits, including any rights to continuation of benefits under COBRA," the Company has issued no such notice to Kahlon of COBRA continuation coverage, nor any other rights concerning benefits, in violation of law.

57.     Kahlon also seeks interest at the statutory 9% rate per year and mandatory liquidated damages under Article 6 of the New York Labor Law given Defendant's willful withholding and deduction of Kahlon's wages.

58.     Kahlon is also entitled to future payments from the Company subject to the terms of the Employment Agreement, as discussed above.

59.     Kahlon's Company stock option rights which were suspended upon his termination without the required thirty-day notice period must also be reengaged.

## FIRST CAUSE OF ACTION AGAINST THE COMPANY
### (Breaches of the Employment Agreement)

60.     Kahlon repeats and realleges the allegations of paragraphs 1 through 59 of the Complaint as though fully set forth herein.

61.     The Employment Agreement is a binding and enforceable agreement entered into between Kahlon and the Company.

62.     Kahlon performed under the Employment Agreement and did not engage in any activity that warranted terminating him for cause under the Employment Agreement.

63.     As a result the Company terminated Kahlon without cause.

64.     The Company has breached the Employment Agreement by, among other things: failing to fulfil the requirements therein, including by failing to provide the required thirty (30) day cure period and/or notice of termination prior to terminating Kahlon; misrepresenting Kahlon's reason for termination; excluding Kahlon from exercising his Company stock option grant rights; and refusing to provide compensation to Kahlon as required under his Employment Agreement upon termination, including base pay and cash bonus equivalents, and payment of applicable premiums otherwise payable for COBRA continuation coverage.

65.     As a result of the Company's breaches of the Employment Agreement, Kahlon has been damaged and continues to be damaged in an amount to be determined at trial, but in no event less than $1,000,000.00.

66.     Due to the Company's withholding of wages and compensation due upon termination, Kahlon is also entitled to damages for unreasonably delayed payment of his wages, interest at the pre-judgment annual rate of 9%, and attorneys' fees, costs, and expenses.

67.     The Company acted intentionally, maliciously and in wanton disregard of Kahlon's rights and punitive damages should be awarded as against the Company.

## SECOND CAUSE OF ACTION AGAINST THE COMPANY
### (N.Y. Labor Law §§ 190 et seq.)

68.     Kahlon repeats and realleges the allegations of paragraphs 1 through 67 of the Complaint as though fully set forth herein.

69.     Kahlon did not engage in any activity that warranted terminating him for cause under the Agreement.

70.     As a result the Company terminated Kahlon without cause.

71.     The Company has willfully withheld and deducted Kahlon's wages due to him within the time period prescribed by law.

72.     The Company's failure and refusal to pay the above constitutes a willful withholding of wages in violation of Article 6 of the New York Labor Law.

73.     As a result of the Company's violations Kahlon is entitled to recover liquidated damages equal to the amount of the wages withheld and deducted, in an amount to be determined at trial, but not less than $500,000.00.

74.     Due to the Company's withholding of wages, Kahlon is also entitled to damages for unreasonably delayed payment of his wages, interest at the annual pre-judgment rate of 9%, and attorneys' fees, costs and expenses.

75.     The Company acted intentionally, maliciously and in wanton disregard of Kahlon's rights and punitive damages should be awarded as against the Company.

## THIRD CAUSE OF ACTION AGAINST THE COMPANY
### (Declaratory Judgment)

76.     Kahlon repeats and realleges the allegations of paragraphs 1 through 75 of the Complaint as though fully set forth herein.

77.     Kahlon did not engage in any activity that warranted terminating him for cause under the Employment Agreement.

78.     As a result the Company terminated Kahlon without cause.

79.     As alleged above, the Company breached the Employment Agreement, and has refused to provide Kahlon with compensation he is owed upon termination thereunder, including funds and benefits that are required to be paid to him up and into 2022.

80.     Kahlon is entitled to a declaratory judgment stating that he is required under Section 6.1 of the Employment Agreement to receive from the Company compensation including that owed to Kahlon upon termination, including base pay and cash bonus equivalents, and payment of applicable premiums otherwise payable for COBRA continuation coverage.

## FOURTH CAUSE OF ACTION AGAINST THE COMPANY
### (Violation Of The Duty Of Good Faith And Fair Dealing)

81.     Kahlon repeats and realleges the allegations of paragraphs 1 through 80 of the Complaint as though fully set forth herein.

82.     Under New York law, each party to a contract has a duty of good faith and fair dealing toward the other party to the contract.

83.     The Company, by its actions and inactions as set forth herein, violated its duty of good faith and fair dealing towards Kahlon.

84.     As a result of the Company's breaches of the duty of good faith and fair dealing, Kahlon has been damaged in an amount to be determined at trial.

85.     The Company acted intentionally, maliciously and in wanton disregard of Kahlon's rights and punitive damages should be awarded as against the Company.

## FIFTH CAUSE OF ACTION AGAINST THE COMPANY
### (Violation of COBRA Notice Requirement under
### 29 U.S.C. § 1161 *et seq.*, § 1132, 29 CFR § 2575.502c-1)

86.     Kahlon repeats and realleges the allegations of paragraphs 1 through 85 of the Complaint as though fully set forth herein.

87.     The Company was required to provide Kahlon notice of the availability of continued benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161 *et seq.*, upon his termination from employment with the Company within the statutorily prescribed time.

88.     The Company not done so.

89.     The Company's failure to provide Kahlon with the COBRA notice constitutes a willful violation of the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161 *et seq.*

90.     As a result of the Company's violations Kahlon is entitled under 29 U.S.C. § 1132 and 29 CFR § 2575.502c-1 to recover statutory damages at the rate of $110 per day of violation, totaling an amount to be determined at trial.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff, Julian Kahlon, demands judgment against Defendant, Project Verte Inc., as follows:

        (a)     awarding compensatory damages against the Company for its breach of the Employment Agreement in an amount to be determined at trial but in no event less than $1,000,000.00;

(b)     awarding Kahlon damages against the Company pursuant to the New York Labor Law, in an amount to be determined at trial but in no event less than $500,000.00;

(c)     awarding Kahlon damages against the Company pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 at the maximum statutory rate of $110 per day of violation, in a total amount to be determined at trial;

(d)     awarding Kahlon liquidated damages from the Company in an amount to be determined at trial but in no event less than $500,000.00;

(e)     awarding Kahlon punitive damages under applicable law, including the New York Labor Law, in an amount to be determined at trial but in no event less than $1,000,000.00;

(f)     awarding the costs of this action, together with reasonable attorneys' fees as provided under applicable law, in an amount to be determined at trial;

(g)     awarding pre-judgment and post-judgment interest as provided by law;

(h)     a declaratory judgment that that Kahlon is required to receive future compensation from the Company to which he is entitled, including base pay and cash bonus equivalents, and payment of applicable premiums otherwise payable for COBRA continuation coverage;

(i)     a permanent injunction to prevent the Company from preventing Kahlon from exercising his rights to purchase stock options in the Company as allowed under the Employment Agreement; and

23

(j)    awarding Kahlon such other and further relief as this Court deems

necessary and proper.

## **JURY DEMAND**

Plaintiff Kahlon, hereby demands a trial by jury of all issues so triable.


Dated: New York, New York
       May 15, 2020

REAVIS PAGE JUMP LLP

By: _____
      Alice K. Jump
      Ethan Krasnoo
      ekrasnoo@rpjlaw.com
      41 Madison Avenue, 41st Floor
      New York, New York 10010
      (212) 763-4100
      *Attorneys for Plaintiff Julian Kahlon*