**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JULIAN KAHLON,

                Plaintiff,

                vs.

PROJECT VERTE INC,

                Defendant.

Civil Action No. 1:20-cv-3774 (MKV)

<u>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**</u>
<u>**MOTION FOR SUMMARYJUDGMENT**</u>

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................................................1

**STATEMENT OF FACTS** ........................................................................................3

   I.  **PROJECT VERTE'S CORPORATE MAKEUP: INVESTORS, DIRECTORS, AND FINANCING** ...............................................................................3

   II.  **PLAINTIFF'S EMPLOYMENT AGREEMENT AS CEO OF PROJECT VERTE** ..............................................................................5

**ARGUMENT** ........................................................................................................12

   I.  **SUMMARY JUDGMENT STANDARD**................................................12

   II.  **THE COURT SHOULD NOT GRANT SUMMARY JUDGMENT** ...... 12

      A.  **Defendant Breached Mr. Kahlon's Employment Agreement.** ...................... 12

         i.  *Defendant Fired Mr. Kahlon Without "Cause."*...........................................13

         ii.  *Defendant Did Not Terminate Mr. Kahlon in "Good Faith."* ....................18

         iii.  *Defendant Failed to Give Mr. Kahlon Notice As Required By His Employment Agreement* ..............................................................21

      B.  **Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Articulates a Separate Theory of Breach of Contract** .......................23

      C.  **Plaintiff Has Plead Violations of NYLL Section 193 For Failure to Pay Earned Severance Wage Supplements Sufficient to Survive Defendant's Motion for Summary Judgment**.......................................................24

**CONCLUSION** .....................................................................................................25

i

## TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*Anderson v. Liberty Lobby*,
477 U.S. 242, 250 (1986) ...................................................................................12

*Apotex Corp. v. Hospira Healthcare India Private Ltd.,*
No. 18-CV-4903 (JMF), 2019 WL 3066328, at *6 (S.D.N.Y. July 12, 2019) ...........................23

*Beach v. HSBC Bank USA, N.A.,*
No. 17CV5153, 2018 WL 3996931, at *9 (S.D.N.Y. Aug. 21, 2018). .............................14, 23, 24

*Bonnie & Co. Fashions v. Bankers Tr. Co.*,
945 F.Supp. 693, 717-18 (S.D.N.Y. 1996) ...............................................................22

*Capuano v. Island Comp. Prods., Inc.,*
382 F. Supp. 2d 326, 338–39 (D. Conn. 2005) ..........................................................18

*Cruz v. FXDirectDealer, LLC,*
720 F.3d 115, 125 (2d Cir. 2013) ...........................................................................19

*Danusiar v. Auditchain USA, Inc.,*
No. 20 Civ. 1477, 2020 WL 6126378, at *8 (S.D.N.Y. Oct. 8, 2020) .................................24

*Gilman v. Marsh & McLennan Co., Inc.,*
85 F.Supp.3d 757, 767 (S.D.N.Y. 2015) ...................................................................17

*Kemelhor v. Penthouse Intern., Ltd.,*
689 F.Supp. 205, 213 (S.D.N.Y. June 3, 1988)...........................................................14

*Kirkland v. Cablevision Sys.*,
760 F.3d 223, 224 (2d Cir. 2014) ...........................................................................12

*Leberman v. John Blair Co.,*
880 F.2d 1555, 1559–60 (2d. Cir. 1989) ...................................................................23

*Markovits v. Venture Info Cap., Inc.*,
129 F. Supp. 2d 647, 654 (S.D.N.Y. 2001) .............................................................21, 22

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280, 286 (2d Cir. 2002) ...........................................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 587 (1986) ...................................................................................12

*Monagle v. Scholastic, Inc.*,
No. 06 Civ. 14342 GEL, 2007 WL 766282, (S.D.N.Y. Mar. 9, 2007) .........................................25

*Naccarato v. Commercial Capital Corp.*,
859 N.Y.S.2d 904 (Sup. Ct. N.Y. Cnty. 2008) ..................................................................22

*Pachter v. Bernard Hodes Group, Inc.*,
541 F.3d 461, 463-64 (2d Cir.2008) .................................................................................24

*Perry v. Int'l Transp. Workers' Fed'n*,
750 F. Supp. 1189, 1194 (S.D.N.Y. 1990) .......................................................................12

*Prudential-Bache Sec., Inc. v. Caporale*,
664 F. Supp. 72, 74 (S.D.N.Y. 1987) ................................................................................18

*Race v. Goldstar Jewellery, LLC*,
84 A.D.3d 1342, 1343 (2d Dept. 2011) ............................................................................17

*Reiss v. Arabian Am. Oil Co.*,
279 A.D. 805 (2d Dep't 1952), aff'd, 304 N.Y. 953, 110 N.E.2d 888 (1953) .............................19

*Research Frontier Inc. v. Prelco Inc.*,
18-CV-2939, 2020 WL 6746730, at *7 (E.D.N.Y. Nov. 17, 2020) .......................................22

*Rothenberg v. Lincoln Farm Camp, Inc.*,
755 F.2d 1017, 1020–21 (2d Cir. 1985) ...........................................................................19

*Ryan v. Kellogg Partners Institutional Servs.*,
19 N.Y.3d 1, 16, 945 N.Y.S.2d 593, 602, 968 N.E.2d 947 (2012) .............................................25

*Scudder v. Jack Hall Plumbing & Heating, Inc.*,
302 A.D.2d 848 (2003)....................................................................................................22

*Sudul v. Computer Outsourcing Services, Inc.*,
917 F.Supp. 1033, 1045 (S.D.N.Y. 1996) ........................................................................19

*Swan Media Grp., Inc. v. Staub*,
841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012) ......................................................................12

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
487 F.3d 89, 98 (2d Cir. 2007) ........................................................................................23

*Welland v. Citigroup, Inc.*,
No. 00 Civ. 738, 2003 WL 22973574, at *13) ..................................................................14

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ...................................................................................................... 12

New York Labor Law §§ 191, 193, 198 ................................................................... 24, 25

## **PRELIMINARY STATEMENT**

Defendant's Motion for Summary Judgment cannot escape the fundamental problem that has plagued Defendant Project Verte and majority shareholders the AJ Group since they originally decided to terminate Plaintiff's employment for cause – they failed to disguise their pretextual intentions and, as a result, contradict their stated intentions at nearly every turn.  Defendant's true motive in terminating Plaintiff was simple: to further consolidate power among the majority shareholder group on the Board and dilute the shares and voting power of the minority group. Plaintiff, as CEO, was unwittingly caught in this power struggle, and did nothing more than attempt to keep the ship afloat and avoid the threat of piracy by the majority shareholders.

Plaintiff ultimately failed in his efforts, the ship was plundered, and Plaintiff was terminated unfairly.  Defendant succeeded in terminating Plaintiff, kicking Plaintiff and the minority shareholder group off the board, and diluting Plaintiff and the minority shareholder group's shares.  Plaintiff was made to walk the plank for doing nothing more than defending the ship.

And in building its pretextual case against Plaintiff to walk the plank, Defendant made false representations and resorted to bold and barely concealed acts of bad faith. While Defendant insists that Plaintiff blocked the passage of "emergency" convertible notes, it is demonstrably untrue that Plaintiff refused to execute the notes. In fact, on February 28, Plaintiff informed the Board's attorney that he would "love to sign" and that he simply needed to ask questions of the Board's attorney.  In fact, Plaintiff's concerns regarding the need for due diligence with respect to the convertible notes were well founded.  The Company lacked certified financial statements, internal controls to ensure Board neutrality, or any formal valuation for the sake of the convertible notes further corroborated the fact that the AJ Group was breaching their fiduciary duties to the Board,

the Company and to the TNJ shareholder group.  Instead of receiving cooperation and answers,

Plaintiff was fired a mere five days (including a weekend) after being asked to sign the note.

In addition, the AJ Group Board Members representing the majority interests of the

Company made unreasonable, bad faith demands on Plaintiff with the intention of forcing a

termination event.   In fact, despite the AJ Group Board Member's representations to the contrary,

there was no need whatsoever to require Plaintiff's "approval" for the convertible notes as CEO.

This purported requirement is referenced nowhere in the Company's formation documents.   In

fact, this requirement was simply the unilateral mandate of a rogue shareholder group without any

legitimate authority under the founding documents or prior Board precedent.   These actions were

used to pretextually justify the AJ Group shareholders' efforts to depose Plaintiff as CEO.

In fact, the AJ group's behavior in the days before and after the vote on the convertible

notes utterly betray their pretextual and bad faith motives.   For instance, Mr. Chaluts ultimately

signed the notes in early March despite the fact that he is neither CEO nor an officer.   And while

Mr. Chaluts was "authorized' to sign the convertible notes by vote of the board, the board did not

see fit to "authorize" Plaintiff to sign the convertible notes just days earlier.   Most egregiously, at

the same time Plaintiff was being pressured by Defendant's counsel to sign the convertible notes

or the Company would fail to meet its next payroll, the AJ Group's members on the Board

*completed funding of the note without Plaintiff's signature* sufficient to satisfy payroll.   The AJ

Group's members on the Board also mislead the only independent Board Member into believing

that Plaintiff had refused to sign the convertible notes, and that Plaintiff's execution of the

convertible notes was required for implantation of the notes when it was not.   As a result, this

independent Board Member voted to terminate Plaintiff's employment based on inaccurate and

incomplete information.   And despite refusing to fund Project Verte in 2020 while Plaintiff was

still employed, after Plaintiff was fired, Mr. Gol, Mr. Chaluts, through AJ Group, diluted Plaintiff's shares and began funding Project Verte again and continue to do so to this day.

Plaintiff now seeks his day in Court after being unfairly blamed for internal turmoil aboard the ship by those who fomented it. For the reasons set forth below, Plaintiff requests that the Court deny Defendant's Motion for Summary Judgment.

## STATEMENT OF FACTS

## I.    PROJECT VERTE'S CORPORATE MAKEUP: INVESTORS, DIRECTORS, AND FINANCING.

Project Verte is a cloud-based supply chain platform powered by artificial intelligence, designed to help multi-channel retailers expand their sales and streamline their fulfillment operations. The initial investors in Project Verte were TNJ Holdings, Inc., Amir Chaluts, Chaluts Trust, JGFT LLC, PGFT LLC, and Jane Gol (hereinafter "Initial Stockholders"). *See* Plaintiff's Opposition to Defendant's Rule 56.1 Statement and Plaintiff's Statement of Additional and Disputed Facts ("Pl's 56.1") at ¶ 2. Near the beginning of Project Verte's formation, Jossef Kahlon disclosed that he was a "bad actor" to Jane Gol. *See* Pl's 56.1. at ¶ 4. However, despite his "bad actor" status, Jossef Kahlon worked closely with Jane Gol, Amir Chaluts, and Plaintiff from the beginning of Project Verte's formation. *See* Pl's 56.1 at ¶ 12.

Effective August 17, 2018, the Initial Stockholders entered into an Initial Stockholders' Agreement ("ISA"). *See* Pl's 56.1 at ¶ 2. *See* Pl's 56.1.Pursuant to the ISA, Project Verte appointed two directors – Julian Kahlon was appointed by TNJ Holdings, Inc. ("TNJ"), and Jane Gol was appointed by investors Amir Chaluts, Chaluts Family Trust, JGFT LLC, PGFT LLC, and Jane Gol (collectively, the "AJ Group"). *See* Pl's 56.1 at ¶ 3. *See* Pl's. On June 17, 2019, Initial Stockholders approved and ratified an Amended and Restated Stockholders' Agreement (ARSA). *See* Pl's 56.1 at ¶ 5.

Pursuant to the terms of the Amended and Restated Stockholders' Agreement, the Initial Stockholders acknowledged that additional capital would be required to fund Project Verte and that a portion of the capital would be provided by the Initial Stockholders.  *See* Pl's 56.1 at ¶ 7. Pl's. TNJ understood that AJ Group could draw on TNJ's $3.7 million credit that it obtained in January of 2019 for TNJ's portion of future capital contributions. *See* Pl's 56.1 at ¶ 7.

Project Verte covered some of its operating expenses by issuing capital call notices to TNJ and to the AJ Group. *See* Pl's 56.1 at ¶ 10.  TNJ directly paid various third parties, entities, and vendors on behalf of Project Verte. *See* Pl's 56.1 at ¶ 10.  Additionally, Jossef Kahlon provided direct funding to TNJ to fund Project Verte pursuant to the capital call notices. *See* Pl's 56.1 at ¶ 11.  While the AJ Group provided some funding to Project Verte pursuant to these capital call notices, AJ Group did not always pay vendors who were listed on capital call notices.  *See* Pl's 56.1 at ¶ 11.  The Initial Stockholders dispute whether or not and/or to what degree TNJ may have provided funding to Project Verte - while TNJ believed a $3.7 million dollar credit would be applied to its share of capital contributions, AJ Group failed to acknowledge the credit. *See* Pl's 56.1 at ¶ 13.

TNJ and the AJ Group subsequently entered into a First Amendment to the Amended and Restated Stockholders' Agreement with an effective date of July 21, 2019 ("First Amendment"). *See* Pl's 56.1 at ¶ 14.  The intention and expectation behind the First Amendment was to add two non-shareholder independent directors to recruit outside investors. *See* Pl's 56.1 at ¶ 15.  However, while TNJ appointed Yafit Lev-Aretz as a non-shareholder, independent TNJ Director, the AJ Group appointed Jane Gol as the First AJ Director and later appointed Amir Chaluts as the Second AJ Director – two shareholders and interested directors. *See* Pl's 56.1 at ¶ 15.

## II.      PLAINTIFF'S EMPLOYMENT AGREEMENT AS CEO OF PROJECT VERTE

Plaintiff entered into an employment agreement with Project Verte (the "Employment Agreement") in June 2019 with respect to his employment as Chief Executive Officer of Project Verte. *See* Pl's 56.1 at ¶ 16.  Pursuant to the terms of Plaintiff's Employment Agreement, he was to be paid a salary of $140,000/year. *See* Pl's 56.1 at ¶ 16.

Section 3.2 of Plaintiff's Employment Agreement provides:

> 3.2. Duties, Responsibilities and Authority. The Executive shall have such responsibilities, duties and authority as are customarily incident to his position as Chief Executive Officer and as may ***reasonably*** be assigned to him by the Board from time to time. The Executive shall have such authority as is commensurate with the position of Chief Executive Officer of the Company. Without limiting the foregoing, the Executive shall have the authority to make the following decisions and as to the following matters, without further Board approval, once the annual budget has been approved by the Board:
> ….(emphasis added).

*See* Pl's 56.1 at ¶ 17. Pursuant to section 6 of Mr. Kahlon's employment agreement, either party may have terminated Mr. Kahlon's employment with the Company at any time and for any reason upon the delivery by either party to the other party of at least thirty (30) days advance written notice; provided that such notice shall not be required in the event that the Executive's employment is terminated by the Company for "cause" (subject to the Executive's ability to cure the conduct giving rise to such termination…"). *See* Pl's 56.1 at ¶ 45. Moreover, section 6.9.1, which defines acts constituting "cause," provides that in case of a material breach of the agreement or any other agreement with or duty owed to the Company or its Affiliates, which breach (if curable) remains uncured thirty (30) days after receipt of written notice thereof". *See* Pl's 56.1 at ¶ 45.

Up until January 2020, Mr. Kahlon was the initial owner of TNJ Holdings, Inc., at which point he resigned and TNJ Holdings appointed Jossef Kahlon as the director of TNJ Holdings. *See* Pl's 56.1 at ¶ 21.  On February 11, 2020, Amir Chaluts was appointed as the Second AJ Director, and he became the fourth director for Project Verte. *See* Pl's 56.1. at ¶ 22.

On February 20, 2020, Project Verte's board of directors held a meeting. *See* Pl's 56.1. at ¶ 23.  During that meeting, Ms. Gol provided the Board with an update regarding Project Verte's financial situation as well as its unsuccessful efforts to secure financing. *Id*. Ms. Gol advised the board that the Credit Line Agreements had expired and that the current stockholders were no longer willing to continue to provide debt financing to the Company on the terms pursuant to which they had previously funded. *See* Pl's 56.1. at ¶ 23. However, Project Verte had previously decided to hire Ernst & Young to conduct a financial audit for the purpose of raising funds and as of the end of 2019, it was not completed; thus, Project Verte did not have certified financials for Ms. Gol to review. *See* Pl's 56.1. at ¶ 23.

During the February 20, 2020 board meeting, the Board members also discussed that the valuation of the company was estimated to be $30-40 million, a figure that represented what outside investment bank informally believed Project Verte was worth during early fundraising, in or about Spring or Summer 2019, but there was never any formal external valuation performed by a third party to justify such a number.  *See* Pl's 56.1. at ¶ 23.  Additionally, Yafit Lev Aretz, the only independent director, raised concerns with the other Board members and Project Verte's counsel Andrew Hulsh about the lack of neutral Board members, given that three out of the four Board members were also shareholders of Project Verte. *See* Pl's 56.1. at ¶ 23.

The board met again on February 24, 2020 and discussed Project Verte's financial situation. *See* Pl's 56.1. at ¶ 26.  During the meeting, Ms. Gol presented the board with proposed

terms for an emergency bridge loan of up to $5,000,000 that would be offered pro rata to all Initial Stockholders of the Company by way of a convertible note (the "Emergency Bridge Financing"). *See* Pl's 56.1. at ¶ 26.  During the meeting, Jane Gol presented the board with proposed terms for an emergency bridge loan of up to $5,000,000. *See* Pl's 56.1. at ¶ 26.  The convertible note referenced a $50 million valuation and purported to be justified by: (1) discussions at three board meetings, (2) debt that Project Verte had accumulated at that time, (3) the $1.2 million recurring monthly expenses, (4) multiple disputes and litigations brought against Project Verte, (5) partners who were fighting, (6) a "bad actor" on the board, and (7) because no investor had made a written offer. *See* Pl's 56.1. at ¶ 26.  There was never a formal valuation conducted to support the $50-million-dollar valuation referenced in the convertible note. *See* Pl's 56.1. at ¶ 26.

The board met again on February 25, 2020 and discussed the terms of the proposed Emergency Bridge Financing as well as other matters. *See* Pl's 56.1. at ¶ 27.  In addition to the Board members, Shlomi Amoyal, the Chief Financial Officer was also present, because the second meeting "conflated issues of ownership with issues of funding" and his presence was helpful to have in the room. *See* Pl's 56.1. at ¶ 27.  Jossef Kahlon was concerned about the unfair dilution of TNJ's equity in Project Verte if the Board were to vote in favor of the Emergency Bridge Financing. *See* Pl's 56.1. at ¶ 28.  In fact, Jossef Kahlon had disputed the treatment of a $10 million Gray Orange refund, which he believed should have been credited to TNJ's contributions to Project Verte. *See* Pl's 56.1. at ¶ 12.

The board met again on February 26, 2020 and approved the Emergency Bridge Financing. *See* Pl's 56.1. at ¶ 28.  On February 27, 2020, a capital call notice in the amount of approximately $905,000 was issued. *See* Pl's 56.1. at ¶ 29.  Later that day, Sara Rubenstein, who is Project Verte's corporate secretary, sent the convertible notes to Plaintiff to execute in his capacity as CEO of

Project Verte. *See* Pl's 56.1. at ¶ 33.  In addition to serving as Project Verte's corporate secretary, Sara Rubenstein also provided legal services for Project Verte on an *ad hoc* basis and served as general counsel for Continental Ventures, which is owned by Jane Gol and Amir Chaluts. *See* Pl's 56.1. at ¶ 33.

On February 28, 2020, AJ Group wired its pro rata contribution to Project Verte's operating account pursuant to the convertible notes approved by the Board on February 26, 2020, even though the convertibles notes had not yet been signed by Julian Kahlon for implementation and funding, thereby contradicting counsel's assertion that his signature was required for funding. *See* Pl's 56.1. at ¶ 34.

In addition to the February 27, 2020 e-mail that Sara Rubenstein sent to Plaintiff instructing him to sign the convertible notes that had been approved by the board, Project Verte's outside counsel, Andrew Hulsh, engaged in a series of email communications with Plaintiff during the period from February 28 to March 2, 2020 in which Mr. Hulsh reiterated the Board's instruction that Plaintiff sign the convertible notes and communicated to Plaintiff that he was obligated to do so. *See* Pl's 56.1. at ¶ 36.  On February 28, 2020, Julian Kahlon wrote to Andrew Hulsh concerning the convertible notes saying:

> Let me understand something. You are telling me to sign documents that I have just received, just because you're telling me that they're okay to sign? Isn't it the company's right to have a chance to raise funds on better terms? Andrew, as the CEO of Project Verte, I'm asking you to withhold from discussing these matters with anyone within or outside of the company until I fully understand what it is that I am signing. Now please, help me understand. The AJ Group is treating Project Verte as if I/Project Verte will not sign the documents, they will not fund and close the business and if I/Project Verte will sign they will fund. Just to make a couple of hundred thousand dollars and maybe get some equity. It's clear that there is money to fund.
>
> I'm not your rubber stamp and you will respect me as I have respected you. Today's incident opened my eyes. I had asked Sara 3 times for all of Project Verte's documentation. I have them, yes, but I want to make sure that the documents are all

aligned. Especially with all the amendments and agreements that had gone back and forward. I WAS IGNORED. Due to my latest findings regarding Sara, the facts are: 1. She is not Project Verte's general counsel, although she led me to believe that she was. 2. She is the in-house counsel for the AJ Group, which poses a massive conflict of interest. 3. She is Project Verte's secretary, and certainly not acting like one. To think that she is in charge of all the documentation with this obvious conflict of interest keeps me up at night.

*See* Pl's 56.1. at ¶ 36.

In another email, Plaintiff wrote to Mr. Hulsh,

I would love to sign if I knew what I was signing and had all the details. I still haven't gotten the specifics of the voting. I'm trying to go through it and to get the whole picture so I can better understand. I hired a lawyer to guide me through it, but Sara still has not sent me any of the requested paperwork. I had just received something yesterday to sign with context. I have no minutes, no notes, and what questions were. asked at the board meeting. Nothing. It is my responsibility to know what I am signing. Again, Andrew, I want to make sure you read through my email in full.

*See* Pl's 56.1. at ¶ 37.

On March 1, 2020 in response to Mr. Hulsh's email, Mr. Kahlon also stated:

I thought that I had instructed you to not discuss this matter with anyone else besides me until get this resolved. Instead of helping me resolve it, you are making it impossible. I'm the CEO of Project Verte, the company's best interest is above all. Your actions and involvement are unethical, to say the least. I have asked for Verte documents and the board meeting record numerous times over several days and haven't received them. The days of me being a rubber stamp are over!

Our financials are not ready and has been constantly changing for the last 18 months.

[Y]ou know that the majority of the board are the founders and that they are going to vote on matters that involve them, benefiting themselves directly. Are you not seeing it? Don't you think that the bare minimum is to assure clean hands? Tell me what you did to make sure that everything was done clean and that no one can revisit this later and say it wasn't? I'm Project Verte's gatekeeper, do you think you can bully me into signing off on something like that without proper counseling? Especially under the current circumstances. We could've easily done it properly, and you know exactly what I mean, this you didn't do. You can easily call it an ambush, it feels that way to me. Just because of the nature of this kind of

a decision, it deserved more time to thoroughly discuss and understand all of the long term consequences.

This is just a basic action that we had to perform to get some of the responsibility off of us in case of a challenge. You should have got (or me if I knew) a reputable outsider to give us at least a ballpark company valuation. Do you understand that we had valued the company at 315mm on the low end and 900mm on the high end? I have sent you a few emails  that you have yet to comment on. I have asked for your opinion on several matters and you chose to ignore me.

Note: I don't appreciate the tone in your emails, it makes me feel bullied, threatened, and you're pushing me to sign something that looks shady. Please make sure to be professional. I'm asking you again, address my emails. Answer my questions and give me your opinions in writing and I will consider your recommendations.

*See* Pl's 56.1. at ¶ 38.

In an e-mail to Plaintiff dated March 1, 2020, Mr. Hulsh stated that "[t]he Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature." *See* Pl's 56.1. at ¶ 39.  Moreover, in response to Mr. Kahlon's question, "[d]o you agree that the CEO has to sign off on every board decision, including "Board level decisions"? Mr. Hulsh, outside counsel for Project Verte replied, "[n]o, not at all, and this seems to be at the heart of many of the issues. In fact, I strongly disagree with that statement. You work for the Board, and not vice versa. To the contrary, the Board is entitled and has the legal right to consider and sign off on every major decision involving the Company."  *See* Pl's 56.1. at ¶ 42.

The next day, on March 2, 2020, Mr. Kahlon asked Mr. Hulsh the following questions: (7) "[d]id you agree and approve to the 50mm valuation?"; (8) "[d]o you agree that the valuation was 'made' by a board member or members?"; (9) "[d]o you agree that they have no experience or knowledge in doing so?"; (10) "[d]o you agree that they could have picked any valuation?"; (11) "[d]o you know why they had picked the 50mm. And not 70mm or 20mm?"; and (16) "[d]o you

understand that in the last Board meeting, the members that voted are a concerned party?" *See* Pl's 56.1. at ¶ 40.  Despite Defendant's allegations, Mr. Kahlon never refused to sign the convertible notes, but rather asked questions and raised concerns before signing; those questions and concerns were never resolved. *See* Pl's 56.1. at ¶ 41.   When Mr. Kahlon was presented with the convertible notes for his signature, he asked to review the notes with his counsel and proposed many questions and concerns before he signed. *See* Pl's 56.1. at ¶ 41.

On March 3, 2020, less than a week after the Board approved the convertible notes, the Board met again and authorized another officer or director to sign the notes. *See* Pl's 56.1. at ¶ 43. Notably, this was the first time the Board considered whether any officer or director could sign the convertible notes. *See* Pl's 56.1. at ¶ 43.  The Board had not previously voted on whether Plaintiff as an officer was ***required*** to sign the convertible notes. *See* Pl's 56.1. at ¶ 43.  Instead, after approving the convertible notes, they funded it and attempted to pressure Mr. Kahlon to sign the notes without conducting due diligence. *See* Pl's 56.1. at ¶ 38.  Five business days after being presented with the notes, he was terminated by Project Verte. *See* Pl's 56.1. at ¶ 41. Shortly after, Mr. Chaluts signed the convertible notes. *See* Pl's 56.1. at ¶ 43.

The board of Project Verte voted to terminate Mr. Kahlon's employment as CEO on March 5, 2020, solely on the basis of the purported failure to follow a directive of the board; however, Plaintiff never refused a directive of the Board. *See* Pl's 56.1. at ¶ 46. Further, in the termination meeting, the Project Verte Board (1) relied on a termination memorandum that was not disclosed to Plaintiff or Jossef Kahlon at the time of the vote and which included misrepresentations, including the fact that Plaintiff had refused a directive of the board in not  signing, that his signature was necessary to implement the Board vote ratifying the notes, and that  payroll would not be met if the note was not signed by Plaintiff immediately; (2) Plaintiff and  Jossef Kahlon, a TNJ

appointee to the Board, were not present for the meeting for the sake of factual inquiry or to vote; and (3) the only independent director on the Board, Yafit Lev Aretz, relied on the memo and counsel's representations that Project Verte's governance documents required an officer of the Company to sign the convertible notes in deciding to vote in favor of Mr. Kahlon's termination, falsely believing that his purported refusal to sign the notes materially violated his obligations. *See* Pl's 56.1. at ¶ 46.

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014). The proper inquiry is whether there are ***any*** factual issues that can be resolved only at a trial because they may reasonably be resolved in favor of either party, examining evidence in the light most favorable to, and drawing all inferences in favor of, the non-movant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment may be granted only when the non-moving party cannot recover or establish a defense under any circumstance. *Perry v. Int'l Transp. Workers' Fed'n*, 750 F. Supp. 1189, 1194 (S.D.N.Y. 1990).

### II.    THE COURT SHOULD NOT GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### A.    Defendant Breached Mr. Kahlon's Employment Agreement.

Under New York law, to succeed on a breach of contract claim, a plaintiff must demonstrate: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *Swan Media Grp., Inc. v. Staub*,

841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012).   Defendant breached Plaintiff's Employment Agreement by denying him termination-related severance benefits without "cause" as that term is defined in his Agreement. First, Defendant's claim that "cause" existed to deny severance benefits to Mr. Kahlon because of his purported refusal to sign the convertible notes is entirely without merit.  Mr. Kahlon never refused to sign the convertible notes; to the contrary, he said he *would* sign the notes once the good faith questions he raised were resolved.  See Pl. 56.1 at ¶ 37.   And even if he had refused to sign the note, refusing to do so would not have been a basis for cause. Second, Defendant acted in bad faith by finding cause under Plaintiff's contract despite the fact that the note had already been implemented and funded and the circumstances of the emergency (the need to make payroll) resolved on February 26, 2020, *without* Plaintiff's endorsement on the note and *before* it was presented to him for signature. *See* Pl's 56.1. at ¶ 34.  In fact, Defendant acted in bad faith at almost every opportunity while interpreting and enforcing the terms of the Employment Agreement, including by failing to provide Mr. Kahlon a notice of the right to cure as required by his Agreement. *See* Pl's 56.1. at ¶ 34.   In moving for summary judgment, Defendant has not credibly contested Plaintiff's theory of breach by presenting evidence that he failed to follow a directive of the board by waiting five business days to consider his decision, or by demonstrating that Defendant acted with good faith in finding cause and terminating him without notice.  Therefore, Defendant's motion for summary judgment should be denied as a matter of law.

*i.  Defendant Fired Mr. Kahlon Without "Cause."*

Defendant fired Plaintiff without cause and thus owes Plaintiff severance as defined in his employment agreement.  In the instant matter, Plaintiff was an at-will employee under a contract that contained a provision limiting eligibility for an award of severance based on whether the termination was for cause as defined by the contract.  In these situations, an employer has the right

to deny the payment of severance if a cause-based termination is justified by the contract.  *See Kemelhor v. Penthouse Int'l, Ltd.*, 689 F.Supp. 205, 213–14 (S.D.N.Y.1988), aff'd without op., 873 F.2d 1435 (2d Cir.1989) (under New York law, employer has the right to discharge employees pursuant to the terms of the employment contract).  However, while an employer's decision to terminate an employee "for cause" is to be given deference, Courts will only give deference to an employer's "for cause" termination "where that term is not defined."  *See Beach v. HSBC Bank USA, N.A.,* No. 17-CV-5153, 2018 WL 3996931 (WHP), at *7 (S.D.N.Y. Aug. 21, 2018) citing *Welland v. Citigroup, Inc*., 2003 WL 22973574, at *13.  Further, under New York law, the board must determine "just cause" in good faith. *See Kemelhor*, 689F.Supp. at 213 (under New York law, "an employer seeking to discharge an employee by using a clause in the contract vesting the employer with discretion must act in good faith").

Mr. Kahlon's employment agreement defines "cause" to include, in relevant part, "the Executive's repeated or substantial refusal, failure, or inability to perform…". *See* Pl. 56.1 at ¶ 45. Pursuant to the termination letter sent to Plaintiff and records of the Board vote, Defendant voted to terminate Plaintiff's Employment Agreement based on his purported breach of this section.  *See* Pl. 56.1 at ¶ 46.

As a preliminary matter, since Plaintiff's contract defines "cause," deference to the employer is not due.  Moreover, Defendant's argument that they fired Mr. Kahlon because he "repeatedly or substantially" failed to sign and implement the convertible notes fails as a matter of law.  Mr. Kahlon did not "repeatedly or substantially" refuse or fail to sign the convertible notes.  In fact, he acknowledged a willingness to sign the note once his reasonable inquiries were answered, and was ultimately fired a mere five business days after he had originally been presented with the notes.  Pl. 56.1 at ¶.41. Additionally, Defendant failed to provide Mr. Kahlon with material

14

information in a timely fashion despite his repeated justified requests for it.  Pl. 56.1 at ¶ 38.  Nor was Plaintiff's questioning and hesitancy contrary to the Company's interests. In fact, Mr. Kahlon took steps to make sure the Company was accepting financing on favorable terms and in a legitimate manner devoid of self-dealing.  Pl. 56.1 at ¶ 38.  Mr. Kahlon raised the prospect of self-dealing by the AJ Group members on the Board, and took extra precautions, such as getting advice from his own independent counsel, to ensure he was acting in the best interest of the Company. Pl. 56.1 at ¶ 41.

A more detailed review of the chronology of events belies the unreasonableness of the Defendant's directives and the falsity of Defendant's assertion of cause.  On February 27, 2020, Sara Rubenstein emailed Mr. Kahlon, asking him to sign the convertible notes that were approved by the Board. Pl. 56.1 at ¶ 33.   In addition to serving as Project Verte's corporate secretary, Sara Rubenstein also provided legal services for Project Verte on an *ad hoc* basis and served as general counsel for Continental Ventures, which is owned by Jane Gol and Amir Chaluts. Pl. 56.1 at ¶ 33. Mr. Kahlon, as CEO of Project Verte, asked both Sara Rubenstein and Andrew Hulsh, who is outside counsel for Project Verte, for more information regarding the convertible notes and whether the Company could procure alternative, more favorable financing. Pl. 56.1 at ¶ 36.  Mr. Kahlon was particularly concerned about the 50 million dollar valuation of the Company in the convertible notes, which was entirely without basis and not the product of any inquiry, internally or externally, in to the Company's actual value or financing. Pl. 56.1 at ¶ 38.

On February 29, 2020, counsel sent Plaintiff an email stating "[w]e have asked you several times to implement the duly adopted resolutions of the board of directors by signing the convertible note documents that Sara sent you Thursday afternoon. As both Sara and I indicated, the execution

of these documents is *a* critical matter for Project Verte, the failure of which may result in the Company's inability to discharge its many obligations, including current payroll." Pl. 56.1 at ¶ 38.

While Mr. Kahlon attempted to conduct due diligence into the convertible notes, Jane Gol and Amir Chaluts, through their entities AJ Group, wired its *pro rata* contribution to Project Verte's operating account pursuant to the convertible notes - even though the convertibles notes had not yet been executed. Pl. 56.1 at ¶ 35. Instead of encouraging Mr. Kahlon's attempt to investigate whether the convertible notes were based on a legitimate valuation of the Company and whether the Company could procure alternative financing on more favorable terms, Defendant tried to pressure Mr. Kahlon into signing the convertible notes. Pl. 56.1 at ¶ 38.

On March 1, 2020, Plaintiff voiced concerns to counsel that end of year financials for 2019 had not been certified, and that the internal financial data lacked quality or credibility sufficient to determine the wisdom of implementing the notes.  Pl. 56.1 at ¶ 38.  He also raised concerns to counsel that counsel himself had conflicts of interest, and that the AJ Group-led Board majority was likely to engage in unethical self-dealing and minority oppression.  Pl. 56.1 at ¶ 38.  Plaintiff made it clear that more time was needed for him to evaluate the notes given all of these concerns. Pl. 56.1 at ¶ 38.

On March 3, 2020, less than a week after the Board approved the convertible notes, the Board met again and authorized another director (Amir Chaluts) to sign the notes. Pl. 56.1 at ¶ 43. Notably, this was the first time the Board considered whether any officer or director should be authorized to sign and implement the convertible notes. And the Board had not previously voted on whether Plaintiff as an officer was ***required*** to sign the convertible notes. Pl. 56.1 at ¶ 43. Instead, after approving the convertible notes, they funded the notes and satisfied payroll *before* attempting to pressure Mr. Kahlon to sign the notes claiming that payroll had not been met when,

in fact, it had. Shortly after Mr. Chaluts signed the convertible notes, the Board voted to terminate Mr. Kahlon's employment.

In fact, Mr. Kahlon's termination was based on unreasonable and pretextual directives. Even though Defendant asserts that they fired Mr. Kahlon due to his purported refusal to sign the convertible notes, the facts show that Jane Gol and Amir Chaluts funded its share of the convertible notes on February 28, 2020 – two days after the Board approved the funding and ***before*** counsel's email to Plaintiff on February 29, 2020 in which he falsely asserted that Plaintiff's signature was needed to secure upcoming payroll obligations when, in fact, those obligations were satisfied by the payment made on February 28.  As such, Mr. Kahlon's signing of the notes was inconsequential with respect to whether or not they would be funded, and, as a consequence, whether or not the impending payroll would be met.  In fact, the requirement that Mr. Kahlon's "implement" the notes by signature was completely unnecessary.

Defendant asserts that as long as the directives given to an employee by an employer are reasonable, the employee must carry out those instructions and that failure to do so constitutes cause for termination. However, Defendant fails to acknowledge that "[a]n employer cannot ask an employee to do something unreasonable and then fire the employee *for cause* when she fails to do it." *Gilman v. Marsh & McLennan Co., Inc.*, 85 F.Supp.3d 757, 767 (S.D.N.Y. 2015) (emphasis in original); *see also Race v. Goldstar Jewellery, LLC*, 84 A.D.3d 1342, 1343 (2d Dept. 2011) (denying summary judgment for defendant who failed to meet its prima facie burden of showing that its directions to plaintiff were reasonable and that plaintiff did not properly follow those directions).

Defendant's instructions to Plaintiff to sign the Notes was not reasonable. First, the convertible note was based on an unsupported valuation of 50 million dollars. Second, Defendant

ignored and failed to respond to Plaintiff's numerous other reasonable due diligence concerns, including the Company's failure to produce reliable and certified financial records, and the prospect of self-dealing and minority oppression by the AJ Group majority on the Board.  Third, Defendant gave Mr. Kahlon an arbitrarily short amount of time to sign the convertible notes. In fact, Defendant fired Mr. Kahlon less than a week after they asked him to sign the notes. Finally, and most importantly, as stated above, the purported "requirement" that Plaintiff sign the notes for them to be implemented was not, in fact, required for them to be funded.  Therefore, Defendant's directives were unreasonable and thus, Plaintiff should not have been fired for cause for not signing the convertible notes. At the very least, questions of fact remain concerning whether Plaintiff committed any act constituting cause and whether Defendants' instructions to Plaintiff were objectively reasonably.  *See Prudential-Bache Sec., Inc. v. Caporale*, 664 F. Supp. 72, 74 (S.D.N.Y. 1987) (holding that an arbitration award did not establish that an employee was dismissed for cause, despite employer's argument to the contrary, because "[t]he most conspicuous gap in" employer's argument was that the basis for employee's dismissal did "not come within the employment agreement's definition of termination for cause"); *Capuano v. Island Comp. Prods., Inc.*, 382 F. Supp. 2d 326, 338–39 (D. Conn. 2005) ("The more difficult question is whether, on the basis of the undisputed facts in the record, it is proper to conclude as a matter of law that [employer] reasonably based its decision to terminate [employee] on the 'dishonesty' ground set forth in [the 'for cause' definition set forth in the Employment Agreement]. While [employer] had the discretion under the Employment Agreement to decide whether to terminate for cause, much here is disputed about whether Capuano was in fact 'dishonest' in his representations during the interview process."). Therefore, summary judgment should not be granted in Defendant's favor.

### ii.   *Defendant Did Not Terminate Mr. Kahlon in "Good Faith"*

An employer has the right to terminate an employment contract pursuant to a provision therein. *Reiss v. Arabian Am. Oil Co*., 279 A.D. 805 (2d Dep't 1952), *aff'd*, 304 N.Y. 953, 110 N.E.2d 888 (1953). However, "[u]nder New York law, parties to an express contract are bound by an implied duty of good faith." *Apotex Corp. v. Hospira Healthcare India Private Ltd*., No. 18-CV-4903 (JMF), 2019 WL 3066328, at *6 (S.D.N.Y. July 12, 2019) (citing *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)). An employer seeking to discharge an employee by using a clause in the contract vesting the employer with discretion must act in "good faith". *Reiss*, 279 A.D. at 805. *See Rothenberg v. Lincoln Farm Camp, Inc*., 755 F.2d 1017, 1021 (2d Cir.1985); *See also Sudul v. Computer Outsourcing Services, Inc.*, 917 F.Supp. 1033, 1045 (S.D.N.Y. 1996) ("Moreover, under the express terms of the contract and under New York law, the Board of   Directors had to determine just cause "in good faith."); *see also Kemelhor*, 689F.Supp. at 213 (under New York law, "an employer seeking to discharge an employee by using a clause in the contract vesting the employer with discretion must act in "good faith.").

As demonstrated above, Jane Gol and Amir Chaluts, on behalf of Project Verte, fired Mr. Kahlon in bad faith in order to avoid paying him his full severance under his employment agreement by requiring him to follow unreasonable directives.  Further, as set forth below, they also colluded to influence the Board's vote to terminate Plaintiff's Employment Agreement for cause.

More specifically, in the termination meeting, the AJ Group majority of the Project Verte Board (1) relied on a termination memorandum drafted by counsel at the behest of Gol and Chaluts that was not disclosed to Plaintiff or Jossef Kahlon at the time of the vote and which included misrepresentations, including the fact that Plaintiff had refused a directive of the board in not signing, that his signature was necessary to implement the Board vote ratifying the notes, and that

payroll would not be met if the note was not signed by Plaintiff immediately; (2) failed to secure the attendance of Plaintiff and Jossef Kahlon, a TNJ appointee to the Board for the sake of factual inquiry or to vote; and (3) misled the only independent director on the Board, Yafit Lev Aretz, who relied on the memo and counsel's representations that Project Verte's governance documents required an officer of the Company to sign the convertible notes in deciding to vote in favor of Mr. Kahlon's termination. Pl. 56.1 at ¶ 46.

The representations in the memo and those made to Ms. Lev Aretz in the meeting were untrue for many reasons:  as acknowledged by counsel for Project Verte in email exchanges with Plaintiff, given the Board's ratification of the notes, the governance documents did not require Plaintiff to sign the notes in order for them to be implemented; Plaintiff did not refuse to sign the notes; and the Board had not previously voted on whether Plaintiff, as an officer, was authorized and required to sign and implement the convertible notes.  Pl. 56.1 at ¶ 46.  The representations to Ms. Lev Aretz were also misleading given nondisclosures in the meeting; she was not advised that funding under the note had already taken place before Plaintiff was presented with the note and that payroll and rent *had* been made before the notes were signed, or that a Board member – Mr. Chaluts – and not an officer was later authorized to sign the notes after the fact of funding under its terms had taken place. Pl. 56.1 at ¶ 46. Subsequent to this meeting, the AJ Group resumed funding after March 2020, voted Jossef Kahlon off the Board, and diluted Plaintiff and Jossef Kahlon's shares when the notes later matured and converted to equity. Pl. 56.1 at ¶ 46.

For the reasons set forth above, Defendants terminated Plaintiff's employment on false pretenses – the real reasons for his termination were to allow Gol and Chaluts to move forward with their self-serving agenda of obtaining financial benefit from the convertible notes, and to avoid paying Plaintiff what he was entitled under the Employment Agreement. Thus, Defendants

did not make a determination of "just cause" in good faith, as required by the Employment

Agreement and New York law

> ### iii. Defendant Failed to Give Mr. Kahlon Notice As Required By His Employment Agreement

Defendant failed to provide notice to Mr. Kahlon prior to firing him as required by his

employment agreement. Pursuant to section 6 of Mr. Kahlon's employment agreement, either party

may have terminated Mr. Kahlon's employment with the Company at any time and for any reason

upon the delivery by either party to the other party of at least thirty (30) days advance written

notice; provided that such notice shall not be required in the event that the Executive's employment

is terminated by the Company for "cause" (subject to the Executive's ability to cure the conduct

giving rise to such termination…"). Pl. 56.1 at ¶ 45. Moreover, section 6.9.1, which defines acts

constituting "cause," provides that in case of a material breach of the agreement or any other

agreement with or duty owed to the Company or its Affiliates, which breach (if curable) remains

uncured thirty (30) days after receipt of written notice thereof". Pl. 56.1 at ¶ 45. This Court has

held that a "warning" such as notice of termination simply cannot perform its function unless it is

provided prior to the termination. *Markovits v. Venture Info Cap., Inc*., 129 F. Supp. 2d 647, 654

(S.D.N.Y. 2001). Notice is ineffective unless it gives an employee time either to attempt to cure

the problem, or to seek other employment before termination. *Id.*

Here, Defendant fired Mr. Kahlon without cause and as such, Defendant was obligated to

give Mr. Kahlon at least 30 days advance written notice before terminating his employment.

Defendant failed to provide any notice and instead fired Mr. Kahlon on March 5, 2020, for

allegedly not signing the convertible notes. Pl. 56.1 at ¶ 47. Moreover, Defendant failed to give

Mr. Kahlon time to cure the alleged misconduct i.e., not signing the convertible notes. On February

26, 2020, the Board voted to approve the funding of convertible notes. Pl. 56.1 at ¶ 28.  The next

day, Sara Rubenstein emailed Mr. Kahlon asking him to sign the convertible notes. Pl. 56.1 at ¶

33.  On February 28, 2020, Jane Gol and Amir Chaluts, through their entity AJ Group, funded their

share of the convertible notes and on March 5, 2020, approximately one week after receiving the

convertible notes to sign, Defendant fired Mr. Kahlon. Mr. Kahlon was not given the opportunity

to cure any breach, if any, and in fact, he was not required to sign the convertible notes. Shortly

before Mr. Kahlon was terminated, Mr. Chaluts signed the convertible notes.

    As such, there is a genuine dispute over whether notice was required before Defendant

terminated Plaintiff's employment and thus, the court should not grant Defendant's motion for

summary judgment. In fact, courts have held that "[w]hether a party's method of terminating the

contract was valid may raise a dispute of fact best reserved for trial." *Research Frontier Inc. v.*

*Prelco Inc.*, 18-CV-2939, 2020 WL 6746730, at *7 (E.D.N.Y. Nov. 17, 2020) (citing *Bonnie &*

*Co. Fashions v. Bankers Tr. Co.*, 945 F.Supp. 693, 717-18 (S.D.N.Y. 1996) (denying summary

judgment regarding the effectiveness of a termination notice, where the contract's termination

clause required written notice transmitted by registered or certified mail, and the terminating party

transmitted written notice by fax)); *see also Naccarato v. Commercial Capital Corp.*, 859

N.Y.S.2d 904 (Sup. Ct. N.Y. Cnty. 2008) (fact questions on whether defendant fired plaintiff in

violation of provision requiring notice, and if they did, if notice was unnecessary as futile was

sufficient to preclude summary judgment on similar cause-based severance employment contract

term); see also *Scudder v. Jack Hall Plumbing & Heating, Inc*., 302 A.D.2d 848 (2003)(employer

breached employment contract with employee who could only be terminated for cause by

discharging employee without following for-cause termination process outlined in employment

contract.); see *Markovits v. Venture Info Cap., Inc*., 129 F. Supp. 2d 647, 654 (S.D.N.Y. 2001)(

Notice of cause, sent more than eight months after employee was terminated, was insufficient to

constitute "notice" required under employment contract in order for termination to be "for cause"; plain meaning of contract's notice requirement was that it be given prior to termination.).

In this case, Mr. Kahlon was not given notice by Defendant of the opportunity to cure, and as such, there is a genuine dispute over whether notice was required before Defendant terminated Plaintiff's employment. Thus, the court should not grant Defendant's motion for summary judgment.

**B.   Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Articulates a Separate Theory of Breach of Contract**

"Under New York law, parties to an express contract are bound by an implied duty of good faith." *Apotex Corp.,* 2019 WL 3066328, at *6 (citing *Cruz*, 720 F.3d at 125). "In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties. *See Beach,* 2018 WL 3996931, at *9. Thus, whether particular conduct violates ... the duty of good faith and fair dealing ... is ordinarily a question of fact to be determined by the jury...." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 98 (2d Cir. 2007). Indeed, summary judgment is ordinarily inappropriate where intent and state of mind are at issue. *See Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559–60 (2d Cir. 1989) ("[It] is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.").

Plaintiff's theory of the breach of duty of good faith and fair dealing, while pled separately, was styled as a breach of contract claim *See* Pl. Compl. at ¶ 82 ("Under New York law, each  party to a contract has a duty of good faith and fair dealing toward the other party to the contract."). The arguments set forth above relating to Defendant's bad faith in interpreting "cause" as defined by Plaintiff's Employment Agreement support Plaintiff's theory of breach of contract claim

predicated on a breach of the implied covenant of good faith and fair dealing. As such, Defendant's motion for summary judgment on Plaintiff's breach of contract claims predicated on a breach of the implied covenant of good faith and fair dealing should not be dismissed. *See Beach,* 2018 WL 3996931, at *9 ("In addition to disputing these assertions, HSBC argues that the implied covenant of good faith and fair dealing does not provide an independent basis for recovery. This is of no moment. *Beach* does not assert this claim as an independent one under the implied covenant. Rather, he styles it as a breach of contract claim predicated on a breach of the implied covenant.).[1]

C.   **Plaintiff Has Plead Violations of NYLL Section 193 For Failure to Pay Earned Severance Wage Supplements Sufficient to Survive Defendant's Motion for Summary Judgment**

Defendant claims that Plaintiff's NYLL claims must be dismissed because Sections 191 and 198 of NYLL Article 6 do not apply to executives. However, Plaintiff pleads claims under both Section 193 and Section 198.  *See* Pl. Compl. at ¶ 71.  Further, Section 198 of NYLL Article 6 does not exclude executives expressly. *Pachter v. Bernard Hodes Group, Inc*., 541 F.3d 461, 463-64 (2d Cir.2008) (noting that "New York Labor Law Article 6 ... includes executives unless otherwise excluded").  Courts have held the availability of remedies under Section 198, if any, will depend on the resolution of the plaintiff's claim under Section 193, and that claims for separation pay under Section 193 are not barred by Labor Law § 198–c (3) which applies narrowly. *See Danusiar v. Auditchain USA, Inc*., No. 20 Civ. 1477, 2020 WL 6126378, at *8 (S.D.N.Y. Oct. 8, 2020) ("Taking as true the plaintiff's allegations that he earned his "wages," which included his salary, bonus and separation pay, and the defendants failed to pay his earned "wages," the Court finds that the plaintiff alleged sufficient factual content that allows the Court to draw the reasonable inference that the defendants are liable for violating Section 193 of NYLL").

---

[1]      Plaintiff concedes dismissal of Plaintiff's Third and Fifth Causes of Action for Declaratory Judgment and Breach of COBRA Notice obligations.

Defendant references *Monagle v. Scholastic, Inc*., No. 06 Civ. 14342 GEL, 2007 WL 766282, (S.D.N.Y. Mar. 9, 2007) in support of its contention that NYLL Section 193 is inapplicable to nonpayment of wage or severance.  The *Danusiar* court addressed and dismissed the *Monacle* holding, stating:

> The defendants assert that "Section 193 has nothing to do with failure to pay wages or severance benefits, governing instead the specific subject of making deductions from wages," relying on *Monagle v. Scholastic, Inc*., No. 06 Civ. 14342 GEL, 2007 WL 766282, at \*2 (S.D.N.Y. Mar. 9, 2007) … The defendants do not make citation to any New York Court of Appeals decision in support of their argument that "Section 193 has nothing to do with failure to pay wages or severance benefits, governing instead the specific subject of making deductions from wages.)

*See Danusiar,* 2020 WL 6126378, at \*8. The *Danusiar,* court cited the New York Court of Appeals decision in *Ryan v. Kellogg Partners Institutional Servs.*, 19 N.Y.3d 1, 16, 945 N.Y.S.2d 593, 602, 968 N.E.2d 947 (2012) as standing for the proposition that where earned wages or supplemental wages such as earned severance pay was concerned, failure to pay constituted a violation of Labor Law § 193.  *Id.*

For these reasons, Plaintiff has alleged facts sufficient for his claims under NYLL § 193 to survive summary judgment.

## **CONCLUSION**

Based on the foregoing, Plaintiff respectfully request that this Court deny Defendant's Motion for Summary Judgment, and issue such further relief as this Court deems just and proper.

Dated: June 1, 2021
    New York, NY

                                            Respectfully submitted,

                              By:     /s/
                                            Christopher Q. Davis (CD-7282)
                                            Rachel M. Haskell (RH-8248)
                                            The Law Office of Christopher Q. Davis
                                            80 Broad Street, Suite 1803
                                            New York, New York 10007
                                            Telephone: (646) 430-7930

*Attorneys for Plaintiff*